***********
With reference to the errors assigned by defendants, the Full Commission finds that defendants have not shown good grounds to reconsider the evidence, receive further evidence or to rehear the parties or their representatives. With reference to the errors assigned by plaintiff, and plaintiff's Renewed Motion For Attorney's Fees and defendants' Response thereto, the Full Commission finds that plaintiff has in part shown good grounds to reconsider the evidence. Accordingly, the Full Commission MODIFIES and AFFIRMS, the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 *********** *Page 2 ISSUES TO BE DETERMINED
1. Whether plaintiff sustained an injury by accident on October 21, 2005 following a two day exposure to cinder block dust resulting in injury to his lungs, and if so, to what compensation, if any, is he entitled.
2. Whether plaintiff's entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.
3. Whether plaintiff's entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.
 *********** EVIDENTIARY MATTERS
At the hearing, defendants submitted the following:
 a. Correspondence dated January 9, 2006, which was admitted into the record and marked as Defendants' Exhibit (1);
 b. Time Cards, which were admitted into the record and collectively marked as Defendants' Exhibit (2);
 c. Masks, which were admitted into the record and collectively marked as Defendants' Exhibit (3) and;
 d. A Packet containing Plaintiff's Personnel and Wage Records, which was admitted into the record and marked as Defendants' Exhibit (4).
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing and in a Pre-Trial Agreement, which was admitted into the record and marked as Stipulated Exhibit (1) as:
 STIPULATIONS *Page 3 
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated and there is no question as to misjoinder or nonjoinder of parties.
4. The carrier on the risk for this claim is Builders Mutual Insurance Company.
5. An employment relationship existed between plaintiff-employee and defendant-employer on October 21, 2005.
6. Plaintiff's average weekly wage is $387.03, yielding a compensation rate of $258.04.
7. Plaintiff alleges that he sustained an accidental injury to his lungs on or about October 21, 2005, following a two day exposure to a large volume of cinder block dust resulting in pulmonary inflammation and total disability.
8. Defendants contend that plaintiff's alleged dust exposure did not result in any compensable consequences.
9. The masonry wall that plaintiff cut on the date in question was made of block that was primarily made up of Portland cement, sand, and cinders, which contained silica as the primary ingredient.
10. At the hearing, the parties submitted the following:
 a. A Packet of Industrial Commission Forms, which was admitted into the record and marked as Stipulated Exhibit (2)(a); *Page 4 
 b. A Packet of Plaintiff's Medical Records, which was admitted into the record and marked as Stipulated Exhibit (2)(b) and;
 c. Photographs, which was admitted into the record and marked as Stipulated Exhibit (2)(c)(1) to (2)(c)(8).
11. Also admitted into the record are the depositions of Dr. Kenneth Shank, Dr. Jill Ohar and Dr. Selwyn Spangenthal.
 ***********
Based upon the foregoing Stipulations and evidence of record, Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is a 50-year-old male, with a date of birth of December 30, 1957. Plaintiff has an eighth grade education, and has been employed in heavy labor his entire adult life. Plaintiff last worked in construction as a carpenter for defendant-employer and as of the hearing date, he had worked for defendant-employer for approximately three and one-half years.
2. Plaintiff is a long-term smoker, having smoked a pack or more of cigarettes a day for approximately thirty (30) years. Plaintiff's medical history includes hypertension, anxiety, allergic rhinitis, headaches, weakness and fatigue, rib pain, and conditions caused by his cigarette smoking, including difficulty breathing, pharyngitis, hoarseness, emphysema, and diffuse chronic obstructive pulmonary disease (COPD).
3. On October 21, 2005, plaintiff was tearing down a cinder block wall, using a sledgehammer and saw. Plaintiff used a masonry saw to cut nine by nine by nine foot holes in a cinder block wall that was twelve (12) inches thick. Tearing down the wall with the sledgehammer and saw took two days. Using the saw created a large amount of dust from the *Page 5 
breakdown of the cinder blocks, which plaintiff inhaled. The cinder block consisted of Portland cement, sand, and cinders, which contained silica. Plaintiff normally worked with wood, and had not been involved in tearing down or out cinder blocks previously. As such, this assignment was not typical of his normal work routine.
4. At or near the time that plaintiff began sawing the cinder bloc wall, he complained about the need for a mask because of the amount of dust. A representative of defendant-employer's searched for a mask and found a paper mask similar to the type used by painters. Thereafter, plaintiff used this mask, even though, as he testified, and the Full Commission finds as fact, that the mask was ineffective as it was not designed for the type protection needed for this task.
5. Plaintiff's sawing of the cinder block wall created such a large amount of dust that he could not see to the end of the plant, and the workers could not see one another. Also, plaintiff could not see his clothes or the color of his skin due to the amount of dust. Plaintiff inhaled this dust throughout the two-day period he was tearing down the wall with the saw and sledgehammer.
6. After sawing the cinder block for this two day period, plaintiff began experiencing trouble breathing, and had chest pains. These acute symptoms concerned plaintiff, so he reported then to his supervisor, Mr. Al Gibson, and went home.
7. Plaintiff's symptoms persisted over the weekend, so he sought treatment from Dr. Kenneth Shank, his primary care physician, on October 24, 2005. On that date, plaintiff was examined by the physician's assistant, and reported experiencing shortness of breath. Dr. Shank was concerned about possible heart problems, and after consulting a cardiologist, referred plaintiff to the emergency room. *Page 6 
8. Plaintiff was then examined at the Stanly Memorial Hospital Emergency Room later that date, where his symptoms included with chest pain, dizziness, and having a headache. EKG taken on October 24 and October 25, 2005 had normal results. Plaintiff also underwent an MRI of the brain, neck, and head, which also produced normal results. However, a chest x-ray revealed that plaintiff had hyperinflated lungs, with evidence of underlying chronic obstructive lung disease.
9. On November 14, 2005, plaintiff sought additional treatment from Dr. Patrick Anonick for chest pains. Plaintiff underwent an exercise stress echocardiogram, which revealed negative findings. Dr. Anonick indicated that from a cardiovascular standpoint, plaintiff was able to return to work as of November 14, 2005.
10. After ruling out a cardiac component to plaintiff's condition, Dr. Shank referred him for a pulmonary function test, which showed moderate obstructive ventilatory defect with a mild reduction in diffusion capacity.
11. Plaintiff returned to see Dr. Shank on November 16, 2005, at which time he first told Dr. Shank that his shortness of breath began when he was around a lot of dust and paint fumes at work. As of this date, plaintiff continued to complain of shortness of breath, especially when around dust and paint fumes, as well as being lightheaded when he stood up or tried to do anything, or if he got up on steps or any elevation.
12. At the November 16, 2005 examination, Dr. Shank changed his focus to plaintiff's pulmonary problems and diagnosed plaintiff as having sustained an exacerbation of his underlying emphysema and COPD, and possible pneumonitis. Dr. Shank attributed plaintiff's underlying COPD to his smoking. Dr. Shank recommended that plaintiff stay away *Page 7 
from dust and fumes, avoid going up ladders and to quit smoking. Also, Dr. Shank began treating plaintiff with a course of steroids.
13. Dr. Shank has been plaintiff's primary care physician since May 2003, and he last saw plaintiff on June 21, 2006. In describing plaintiff's complaints prior to October 24, 2005, Dr. Shank testified that plaintiff complained of hoarseness previously, and his physician's assistant diagnosed him with possible sleep apnea. Dr. Shank also testified that he knew plaintiff smoked one to two packs of cigarettes per day for many years, but that even so, on October 24, 2005 was the first time plaintiff reported an acute shortness of breath and chest pains.
14. Plaintiff returned to work by the time he came back to see Dr. Shank on November 30, 2005. When Plaintiff went to talk to speak with Mr. Gibson, Mr. Gibson informed him that there was no light duty work in a dust free environment for him to do at that point.
15. Plaintiff treated with Dr. Herbie Bryan of Albemarle Pulmonary Services on December 12, 2005, upon the referral of Dr. Shank. On that date plaintiff complained of worsening shortness of breath and vague chest pains. Dr. Bryan noted that plaintiff presented as a moderately obese man smelling strongly of cigarette smoke.
16. Plaintiff underwent a chest x-ray and CT scan, which revealed no evidence of any infiltrative process, no fibrosis or scarring, and marked emphysema through both lung fields with no evidence of pulmonary embolic disease. Pulmonary function tests showed moderate obstructive ventilator defect with a mild reduction in diffusion capacity, and an FEV1 of 62 percent of predicted.
17. Dr. Bryan diagnosed plaintiff with dyspnea secondary to moderately advanced COPD, allergic rhinitis, and possible sleep apnea. Dr. Bryan found no evidence of an interstitial *Page 8 
pneumonitis to suggest toxic inhalation from concrete dust. However, due to plaintiff's moderately advanced emphysema, he noted that any work-related air pollution might have aggravated plaintiff's breathing difficulties. Dr. Bryan recommended immediate and complete smoking cessation, and treatment with antihistamines, aerosol steroids, and use of an inhaler for plaintiff's condition.
18. Despite recommendations from Dr. Shank and Dr. Bryan, plaintiff continued smoking subsequent to his dust exposure on October 21, 2005. Plaintiff testified that he continued smoking cigarettes through March 2006.
19. Plaintiff underwent an independent medical examination (IME) by Dr. Selwyn Spangenthal of Charlotte Lung Health on November 2, 2006. Dr. Spangenthal noted plaintiff's longstanding history of cigarette abuse, his history of chronic bronchitis and emphysema secondary to cigarette abuse, and acute exposure to a large amount of dust, sand, and concrete inhalation with subsequent worsening of shortness of breath and reactive airway disease.
20. Plaintiff underwent a CT scan of the chest on November 2, 2006, which revealed findings suspicious for basilar interstitial lung disease. As a result of the November 2, 2006 CT scan, plaintiff underwent a high resolution CT scan of the chest on November 21, 2006, which revealed mild to moderate bilateral upper lobe parietal and centrilobular emphysema, hyperinflation with areas of linear pleural parenchymal scar at the lung bases, most likely due to prior inflammation, and mild right-sided pleural thickening with a small focus of calcification, also likely due to prior inflammation.
21. Plaintiff saw Dr. Spangenthal again on November 29, 2006, at which time he was diagnosed as having chronic bronchitis and emphysema secondary to longstanding cigarette *Page 9 
abuse, along with reactive airway disease. Dr. Spangenthal recommended that plaintiff stay out of dusty environments. Dr. Spangenthal was of the opinion that plaintiff's heavy exposure to the cinder block dust most likely resulted in acute exacerbation of his underlying COPD. Dr. Spangenthal based his opinion primarily on plaintiff's work history of breathing in a large amount of material and cinder dust over a short period of time, as well as his development of acute symptoms. Dr. Spangenthal also had the benefit of prior medical records and his own examination.
22. Dr. Spangenthal reviewed plaintiff's medical records that existed prior to the injury date, as well as the chest x-ray from April 21, 2005. Dr. Spangenthal testified that the April 2005 x-ray was normal, but the November 2006 x-ray was abnormal. Plaintiff's prior medical records revealed evidence of diffuse COPD consistent with cigarette smoking, with no active infiltrates, indicating that there was no evidence of any scarring or any shadows in the lung. The lung fields were clear, but hyper-inflated. Dr. Spangenthal testified, and the Full Commission finds as fact, that any COPD plaintiff had prior to October 21, 2005 involved no active scar tissue, and the COPD was not indicative of any condition that was disabling prior to his inhalation of cinder dust on October 21 through October 22, 2005. *Page 10 
23. Dr. Spangenthal recommended several treatments, which he felt would be advantageous to plaintiff. Dr. Spangenthal was of the opinion that plaintiff should be treated with bronchial dilators to open up the airway passages, and an inhaled steroid such as Advair, to help decrease any airway inflammation that might be present.
24. In lieu of pulmonary rehabilitation, Dr. Spangenthal initially recommended starting with medical treatment to see how plaintiff responded. Dr. Spangenthal believed that it was possible that plaintiff could have a very good response, and would not require pulmonary rehabilitation.
25. On May 4, 2007, plaintiff underwent an evaluation with Dr. Jill A. Ohar, a Professor of Internal Medicine and Director of Clinical Operations at Wake Forest University. Dr. Ohar examined plaintiff and reviewed his medical records. Dr. Ohar and opined, and the Full Commission finds as fact, that plaintiff's COPD was most probably exacerbated by the cinder dust inhalation. In her report, she indicated that it is well known that exacerbations of COPD are associated with a six to eight week significant reductions in lung function that partially, but rarely, fully return to the level of pre-existing baseline. Dr. Ohar testified that COPD is characterized by a progressive loss of lung function and smoking is the primary risk factor, causing 85 to 90 percent of COPD. Dr. Ohar recommended that plaintiff stop smoking, as well as undergo treatment with Advair, Spiriva, and pulmonary rehabilitation.
26. Based on the history provided, Dr. Ohar ultimately opined, and the Full Commission finds as fact, that plaintiff experienced an acute event, and that, as of Dr. Ohar's assessment, he was unable to return to work due to his resulting shortness of breath. Dr. Ohar opined that smoking cessation would be the first and foremost treatment recommendation for plaintiff. This would improve his lung function temporarily, over the next two years. Next, per global obstructive lung disease guidelines, plaintiff would need a long-acting bronchodilator and pulmonary rehabilitation. Finally, Dr. Ohar recommended prescription medications of Spiriva and Advair, concurrently, to decrease hyperinflation.
27. Dr. Ohar testified that current studies show that pulmonary rehabilitation in conjunction with other chemical therapies produced the best result. Although Dr. Ohar could not predict whether plaintiff would ever be able to return to work, she believed that there was a significant opportunity for improvement *Page 11 
of the exacerbation with the proper treatment. The delay in treatment would not necessarily interfere with later treatment, but lack of treatment would postpone any potential improvement. The Full Commission gives great weight to the opinions of Dr. Ohar.
28. Plaintiff was out of work from October 24, 2005 until the employer offered him a job at the same pay on or around January 10, 2006, wherein plaintiff would answer a telephone in an office next to the canteen. Plaintiff never worked in an office before. Also, the phone he was to answer apparently was not actually hooked up to an operational jack. Nonetheless, plaintiff reported to work for this job, but was unable to continue working in that capacity due to the dust coming into the office from the outside. At approximately 11:30 a.m., plaintiff went to Ms. Angie Pugh and told her he could no longer work because he could not breathe, and he went home.
29. The phone calls to the supervisors' area that plaintiff was supposed to answer are dispatched from another location in the plant. The job offered to plaintiff was a "make work" job, which gave him nothing to do but sit behind a desk to answer a telephone that would not ring because it was not connected. This was not a job typically available in the local labor market. Also, because plaintiff was not offered work in a dust-free environment, the job was not suitable to him physically.
30. Based upon the greater weight of the evidence, the Full Commission finds that plaintiff's job assignment on October 21 through October 22, 2005, which required him to saw and sledge hammer a cinder block wall, constituted an interruption of his normal work routine, and the introduction, thereby, of unusual conditions likely to result in unexpected consequences. Therefore, plaintiff's heavy inhalation of cinder block dust while performing these activities on October 21 through October 22, 2005, *Page 12 
which resulted in disabling shortness of breath, constituted an injury by accident. The medical evidence establishes that this heavy exposure to cinder dust aggravated plaintiff's underlying COPD, and caused his shortness of breath and resulting disability.
31. Although the evidence of disability from a pulmonary standpoint indicates that plaintiff is currently disabled from all work, except very sedentary work, with proper treatment he should be able to return to a higher level of pulmonary function and a higher work category. The evidence does not establish that he is totally and permanently disabled due to his pulmonary condition.
32. As of the date of the close of the record herein, defendant-employer had not offered suitable employment to plaintiff within his restrictions that would not expose him to dust or fumes.
33. Based upon the credible medical and vocational evidence of record, and as a result of his occupational dust exposure injury by accident, plaintiff has been unable to earn any wages in his former position with defendant-employer or in any other employment for the period of October 24, 2005 through the present and continuing.
34. This matter was appealed to the Full Commission by defendants from an Opinion and Award awarding benefits to plaintiff and the Full Commission by its decision herein is affirming the award of the Deputy Commissioner. The Full Commission finds that the costs of the appeal, including reasonable attorney fees, should be paid by defendant-carrier as a part of the bill of costs.
35. Defendants' defense of and actions in this claim were not unreasonable.
 *********** *Page 13 
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident arising out of and in the course and scope of his employment, causing injury to his lungs on or about October 21 through October 22, 2005, due to heavy inhalation of dust from cinder blocks. N.C. Gen. Stat. § 97-2(6).
2. As a result of his injury by accident, plaintiff suffered an acute exacerbation of his underlying and preexisting COPD, causing severe shortness of breath and disability. Henry v. LawrenceLeather Company, 234 N.C. 126, 66 S.E.2d 693 (1951).
3. Based upon the credible medical and vocational evidence of record, and as a result of his occupational dust exposure injury by accident, plaintiff is entitled to have defendants pay to him ongoing total disability compensation at the rate of $258.04 per week for the period of October 24, 2005 through the present and continuing until such time as he returns to work, or further Order of the Commission. N.C. Gen. Stat. § 97-29.
4. Plaintiff is not permanently and totally disabled, as the evidence establishes that his condition is likely to improve with proper treatment. N.C. Gen. Stat. § 97-29.
5. As a result of his injury by accident plaintiff is entitled to have defendants pay for all related medical expenses incurred or to be incurred, subject to the provisions of N.C. Gen. Stat. § 97-25.1, including expenses associated with the treatment previously rendered by Dr. Shank, Dr. Spangenthal, Dr. Ohar, Stanly Memorial Hospital, and Dr. Bryan, when the medical bills have been approved according to established Industrial Commission procedures. N.C. Gen. Stat. §§ 97-25; 97-25.1.
6. Dr. Spangenthal is hereby authorized as plaintiff's treating physician. *Page 14 
7. Because this matter was appealed to the Full Commission by defendants from an Opinion and Award awarding benefits and results in the affirmation of that award, plaintiff is entitled to a reasonable attorney's fee as determined by the Full Commission to be assessed against defendant pursuant to N.C. Gen. Stat. § 97-88 as a part of the bill of costs.
8. Because defendants' defense of and actions in this claim were not unreasonable, plaintiff is not entitled attorney fees under N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to plaintiff ongoing total disability compensation at the rate of $258.04 per week for the period from October 24, 2005 and continuing until such time as he returns to work, or further Order of the Commission From the amounts having accrued, this compensation shall be paid to plaintiff in a lump sum. This compensation is subject to the attorney's fee approved herein.
2. Defendants shall pay for all related medical expenses incurred or to be incurred by plaintiff as a result of his injury by accident, subject to the provisions of N.C. Gen. Stat. § 97-25.1, including expenses associated with the treatment previously rendered by Dr. Shank, Dr. Spangenthal, Dr. Ohar, Stanly Memorial Hospital, and Dr. Bryan, when the medical bills have been approved according to established Industrial Commission procedures.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded herein is approved for counsel for plaintiff. From the compensation having accrued, *Page 15 
this fee shall be deducted from the amounts due plaintiff and paid directly to counsel for plaintiff, with counsel for plaintiff receiving every fourth check thereafter.
4. Dr. Spangenthal is hereby authorized as plaintiff's treating physician.
5. Plaintiff's counsel shall submit an affidavit or itemized statement in support of an award of reasonable attorney's fees pursuant to N.C. Gen. Stat. § 97-88 within 10 days of the filing of this Opinion and Award for the time expended preparing and litigating this appeal. Upon receipt of the affidavit, the Full Commission will issue the appropriate Orders directing defendants to pay an additional attorney's fee directly to plaintiff's counsel.
6. Defendants shall pay the costs.
This the __ day of August 2009.
S/________________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/________________________ DIANNE C. SELLERS COMMISSIONER